# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 39409

SILICON INTERNATIONAL ORE, LLC,
an Idaho limited liability company,

    Plaintiff-Appellant,

v.

MONSANTO COMPANY, a Delaware
corporation, and WASHINGTON GROUP
INTERNATIONAL, INC., an Ohio
corporation,

    Defendants-Respondents.

_____

Idaho Falls, May 2013 Term

2013 Opinion No. 126

Filed: November 27, 2013

Stephen W. Kenyon, Clerk

---

Appeal from the District Court of the Sixth Judicial District of the State of Idaho, Caribou County. Hon. Mitchell W. Brown, District Judge.

The order judgment of the district court is <u>affirmed</u>. Attorney's fees on appeal and costs on appeal are awarded to Respondents.

Moffatt, Thomas, Barrett, Rock & Fields, Chtd, Pocatello, and Bennett, Tueller, Johnson & Deere, Salt Lake City, Utah, attorneys for Appellant Silicon International. Barry A. Johnson argued.

Racine, Olsen, Nye, Budge & Bailey, Chtd., Pocatello, attorneys for Respondent Monsanto Company. Randall C. Budge argued.

Hawley, Troxell, Ennis & Hawley, LLP, Boise, attorneys for Respondent Washington Group. Jason D. Scott argued.

_____

W. JONES, Justice

## I. NATURE OF THE CASE

Plaintiff, Silicon International Ore, LLC ("SIO"), appeals the district court's entry of summary judgment in favor of defendants, Monsanto Company ("Monsanto") and Washington

Group International, Inc. ("WGI"), in a lawsuit brought by SIO against Monsanto and WGI for alleged breach of contract, intentional interference with SIO's operations under said contract and breach of the implied covenant of good faith and fair dealing.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Monsanto, through a wholly owned subsidiary, owns a quartzite mine near Soda Springs, Idaho. Monsanto and WGI contracted with each other for WGI to operate the quartzite mine. This agreement was memorialized in the Quarzite Agreement ("First Quarzite Agreement"), which expired at the end of 2002. A by-product of WGI's operations at the quarry was silica sand, which was too small for Monsanto to use in its manufacturing.

In early 2000, SIO contacted Monsanto about acquiring the silica sand. Both Monsanto and WGI met with SIO to discuss SIO's proposed business plan. SIO presented Monsanto with a proposed contract[1], but the proposed contract was never executed. However, on November 29, 2000, Monsanto and WGI executed an Addendum to the First Quarzite Agreement ("First Addendum"). The First Addendum authorized WGI to construct and operate a processing facility for silica sand at the quartzite mine and to pay Monsanto royalties of $13.00 per ton of processed silica sand that was sold by WGI to a third party. On December 1, 2000, SIO and WGI executed the Master Agreement, under which WGI agreed to provide "a portion of the silica sand within its control" to SIO; SIO agreed to pay for the construction of the processing facility for the silica sand; SIO agreed to pay WGI to dry, screen, and bag the silica sand; SIO agreed to pay WGI an additional $13.00 per ton for the processed silica sand; and WGI agreed to load the bagged silica sand onto SIO trucks. The Master Agreement was effective for five years, and it provided that title to the silica sand would pass to SIO upon delivery of the silica sand by WGI. Shortly thereafter, on December 19, 2000, Robert Sullivan, an officer of SIO who signed the Master Agreement, wrote a letter to Monsanto saying "we are pleased that the intent seems to be a long-term relationship."

Shortly before the First Quarzite Agreement was set to expire in September of 2001, Monsanto and WGI executed a second Quarzite Agreement ("Second Quarzite Agreement"). Because the Second Quarzite Agreement by its terms terminated the First Quarzite Agreement,

---

[1] The terms of the proposed contract were as follows: (1) SIO would directly purchase the silica sand from Monsanto; (2) Monsanto would provide SIO with a facility and land necessary to process the sand; (3) SIO would purchase at least 500 tons of silica sand in the first year, an amount which increased in subsequent years; (4) the agreement would be effective for twenty (20) years.

on March 1, 2002, Monsanto and WGI executed a new addendum to the Second Quarzite Agreement ("Second Addendum"). The Second Addendum was almost identical to the First Addendum but provided that WGI would pay Monsanto between $3.00 and $13.00 per ton of silica sand based on several considerations and that the "[t]itle to the silica sand sold by SIO shall pass directly from [Monsanto] to SIO upon processing . . . subject to payment." The Second Addendum also provided that Monsanto would make available enough silica sand to allow SIO to sell up to 25,000 tons of processed sand a year.

The Master Agreement between WGI and SIO expired on December 1, 2005. WGI continued providing silica sand to SIO for two additional years.[2] On December 28, 2007, WGI notified SIO that it would no longer be providing SIO with silica sand after the end of the year. After discussions with SIO, SIO was permitted to continue processing and bagging sand through April 29, 2008. SIO dismantled its operations in the quarry and removed its building and equipment.

On December 31, 2009, SIO sued Monsanto and WGI for damages for violating and interfering with an alleged verbal agreement to continue processing silica sand. SIO alleged that it and Monsanto entered into a verbal agreement separate and apart from the Master Agreement for the sale of silica sand. SIO alleged that the terms of the verbal agreement were as follows: (1) Monsanto agreed to furnish SIO with certain agreed-upon quantities of silica sand if processed in a safe and environmentally friendly manner; (2) SIO could sell the processed sand to third parties, but Monsanto reserved the right to limit the markets in which SIO could sell the sand; (3) SIO could extract sand from the quarry; and (4) the agreement would remain in full force so long as mutually beneficial to both SIO and Monsanto. SIO further alleged that it and Monsanto understood the agreement to be mutually beneficial so long as (1) SIO conformed to Monsanto's environmental, safety, and control regulations; (2) SIO paid Monsanto an agreed-upon royalty; and (3) SIO permitted Monsanto to control the markets in which SIO could sell the sand. So long as these requirements were met, SIO alleged the verbal agreement provided that Monsanto would continue to provide sand from the quarry.

Against Monsanto, SIO asserted breach of the alleged verbal agreement, breach of the implied covenant of good faith and fair dealing, equitable estoppel, and quasi-estoppel.

---

[2] Though the Master Agreement expired on December 1, 2005, WGI continued to sell sand to SIO through 2007 because the Second Addendum between WGI and Monsanto provided for the provision of sand to SIO through 2007.

3

Monsanto denied SIO's claims and asserted the statute of frauds, I.C. §28-2-201(1), as an affirmative defense. Against WGI, SIO claimed that WGI breached the covenant of good faith and fair dealing implied into the Master Agreement, and SIO alleged that WGI tortiously interfered with the alleged verbal agreement between SIO and Monsanto.

On January 25, 2011, Monsanto and WGI filed motions for summary judgment. Monsanto argued that the verbal agreement was too indefinite and uncertain to constitute a contract, that the verbal agreement was void under the statute of frauds, and that SIO could not prove damages. WGI argued that the verbal agreement was too indefinite and uncertain to constitute a contract, that SIO could not prove damages, and that the verbal agreement is contrary to the express terms of the Master Agreement.

In its opposition to the motions for summary judgment, SIO offered an email correspondence between its employee, Robert Sullivan, and Mitchell Hart, a former employee of Monsanto, from March 13, 2008, ("Hart email"). In that email, Hart, who was SIO's contact at Monsanto at the time the alleged verbal agreement was formed but no longer works at Monsanto, affirmed that the following was a fair statement of the discussions between SIO and Monsanto: "we both concur that an agreement exists between Monsanto and [SIO] in that Monsanto represented to us that we would be allowed to continue to operate as long as it was mutually beneficial for us to do so." Monsanto challenged the statement as inadmissible hearsay and sought to strike the email. SIO argued that the statement was not hearsay but was admissible under the residual exception to the hearsay rule provided by I.R.E. 803(24).

On September 21, 2011, the district court entered its Memorandum Decision and Order, which granted Monsanto's motion to strike the Hart email as inadmissible hearsay. The district court also granted Monsanto summary judgment on the basis that the alleged verbal agreement was unenforceable under the statute of frauds and was vague, indefinite, or uncertain with respect to its essential terms. The district court granted WGI summary judgment on SIO's claims against it on the basis that there was no evidence that WGI knew of the separate oral agreement between SIO and Monsanto, and the district court found that SIO failed to support its claims for damages on the intentional interference with contract claim. Final Judgment was entered on October 7, 2011. SIO appealed on November 18, 2011.

### III. ISSUES ON APPEAL

4

1. Whether the district court abused its discretion by excluding the Hart email from summary judgment consideration.

2. Whether the district court erred when it granted summary judgment in favor of Monsanto on SIO's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, equitable estoppel, and quasi-estoppel.

3. Whether the district court erred when it granted summary judgment in favor of WGI on SIO's claims for tortious interference with a contractual relationship and breach of the implied covenant of good faith and fair dealing.

4. Whether Monsanto and WGI are entitled to attorney fees on appeal.

## IV. STANDARD OF REVIEW

An appeal from summary judgment is reviewed under the same standard a district court uses when granting a motion for summary judgment. *A & J Const. Co., Inc. v. Wood*, 141 Idaho 682, 684, 116 P.3d 12, 14 (2005). Under Rule 56(c) of the Idaho Rules of Civil Procedure, summary judgment is proper if "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." If the evidence reveals no disputed issues of material fact, then summary judgment should be granted. *Smith v. Meridian Joint Sch. Dist. No. 2*, 128 Idaho 714, 718–19, 918 P.2d 583, 587–88 (1996). In making this determination, "all disputed facts are liberally construed in favor of the non-moving party." *McCoy v. Lyons*, 120 Idaho 765, 769, 820 P.2d 360, 364 (1991). Summary judgment proceedings are decided on the basis of admissible evidence. *Heinze v. Bauer*, 145 Idaho 232, 236, 178 P.3d 597, 601 (2008). "The moving party is entitled to judgment when the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case . . . ." *Badell v. Beeks*, 115 Idaho 101, 102, 765 P.2d 126, 127 (1988).

Appellate courts examine issues of evidentiary exclusion under the abuse of discretion standard. *Slack v. Kelleher*, 140 Idaho 916, 924, 104 P.2d 958, 966 (2004). "A trial court does not abuse its discretion if it (1) recognizes the issue as one of discretion, (2) acts within the boundaries of its discretion and applies the applicable legal standards, and (3) reaches the decision through an exercise of reason." *Johannsen v. Utterbeck*, 146 Idaho 423, 429, 196 P.3d 341, 347 (2008). "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." I.R.E. 103(a).

5

**A.**    **The district court did not abuse its discretion when it granted the motion to strike the Hart email as inadmissible hearsay.**

SIO argues that the district court erred when it excluded the March 14, 2008, email from Hart on the basis that it was inadmissible hearsay. SIO contends that the Hart email is admissible pursuant to the residual exception to the hearsay rule, I.R.E. 803(24). SIO contends that the evidence should be admissible pursuant to this exception because there is no dispute that the emails are true and correct emails. The emails, according to SIO, are the best evidence of what Hart believed the verbal agreement to be before the commencement of this suit.

Respondents, Monsanto and WGI, maintain that the Hart emails were not actually the best evidence of the alleged verbal agreement between SIO and Monsanto because it was obtained eight years after the alleged agreement. Respondents argue that the Hart email was not the most probative evidence on point because they had the non-hearsay affidavit testimony of Sullivan, and the sworn testimony of Hart could be procured. Even if the Hart email was admissible, Respondents argue the error was harmless because the inclusion of the email would not have changed the outcome of summary judgment because Sullivan's affidavit effectively covered the substance of the Hart email.

The district court found that the Hart email did not satisfy the requirements of the residual exception to the hearsay rule because it was not more probative than other evidence that could be procured on the matter. Particularly, the district court noted that both of the parties involved in the email correspondence, Hart and Sullivan, were available and their personal testimonies could be reasonably procured. The district court found that said testimony would be more probative than the hearsay email. Finally, the district court noted that the email might nonetheless be admissible for impeachment, but ultimately it concluded that such impeachment evidence should not be considered on a motion for summary judgment.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." I.R.E. 801(c). Hearsay is generally inadmissible. I.R.E. 802. The residual exception to the hearsay rule found in I.R.E. 803(24) provides as follows:

> A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other

6

evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence . . . .

I.R.E. 803(24).

We conclude that the district court did not err in finding the Hart email inadmissible under the hearsay rule. Respondents only dispute whether the Hart email was the most probative evidence on point—it was not. First, the statements in the email were not made near the time the alleged verbal agreement was made; rather, it was made eight years after the alleged agreement was made, three years after Hart left his employment at Monsanto, and about three years before trial. Second, evidence of the verbal agreement could reasonably be obtained by the testimony of Hart and Sullivan, both of whom were available to testify. Finally, SIO argues that the email is more probative than Hart's testimony because it is his recollection of the verbal agreement outside the present lawsuit. However, the district court noted that this relates to credibility and impeachment of a witness, and relying on persuasive federal authority it held that such credibility issues should not be considered on summary judgment.[3] Therefore, the district court did not err when it found the Hart email less probative than other evidence that could reasonably be procured. Because summary judgment is decided on the basis of admissible evidence, and since the district court did not abuse its discretion in excluding the Hart email, the district court did not err in granting Respondents' Motion to Strike.

**B.    The district court did not err when it granted Monsanto summary judgment on all of SIO's claims.**

The district court granted summary judgment in favor of Monsanto on all four of SIO's claims, including breach of contract, breach of the implied covenant of good faith and fair dealing, equitable estoppel, and quasi-estoppel.

*1.    Breach of Contract.*

SIO argues that the district court erred in granting Monsanto summary judgment on its breach of contract claim because the district court improperly characterized the alleged verbal

---

[3] *See McMilliam v. Johnson*, 88 F.3d 1573, 1484 (11th Cir. 1996) ("such impeachment evidence, therefore, may not be used to create a genuine issue of material fact for trial"); *Bellard v. Gautreaux*, No. 08-627, 2011 WL 1103320, at *1 (D. La. 2011) ("[Rule 801(d)(2)(A) evidence] is not . . . competent summary judgment evidence . . . ."); *Naylor Med. Sales & Rental, Inc. v. Invacare*, No. 09-2344-STA-cgc, 2010 WL 5055913, at *6 (D. Tenn. 2010) ("even if these hearsay statements might be admissible at trial for impeachment purposes, for these statements to be considered for summary judgment purposes, the statements must be admissible as substantive evidence."); *Gooch v. Md. Mech. Sys., Inc.*, 567 A.2d 954, 963 (Md. App. 1990) ("While proof of a prior contradictory statement may have an evidentiary effect of impeaching the credibility of a witness, it may not be employed as a matter of substantive evidence").

agreement as being solely for the sale of goods. SIO contends that the verbal agreement was not an agreement for the sale of sand but an agreement to operate a facility at Monsanto's quarry, to sell Monsanto's waste, and to pay a royalty to Monsanto. Finally, SIO maintains that the alleged verbal agreement was not indefinite or vague because there was a disputed issue of fact regarding what "mutual benefit" entailed, what "long term" meant, and what "fair and reasonable" royalties were. SIO maintains they raised facts sufficient to make these terms definite.

Monsanto argues that the verbal agreement violates the statute of frauds and is therefore unenforceable because the verbal agreement is predominantly for the sale of sand from Monsanto to SIO in exchange for royalties. Monsanto also argues that the verbal agreement is unenforceable because it is too vague and indefinite. Particularly, Monsanto argues that the contract lacks the essential terms of price, quantity, and duration.

The district court granted Monsanto summary judgment on the breach of contract claim because it found the verbal agreement to be a contract for the sale of goods in excess of $500 and therefore subject to the statute of frauds.

> a. The verbal agreement is unenforceable under the statute of frauds.

Idaho Code § 28-2-201(1) provides in relevant part as follows:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

If an agreement contains terms for the sale of goods and services, the contract is a hybrid contract. *Fox v. Mountain W. Elec., Inc.*, 137 Idaho 703, 709, 52 P.3d 848, 854 (2002). The test for whether a hybrid contract is subject to the UCC is whether the predominant factor, the thrust, the purpose of the agreement is a transaction of sale, with labor incidentally involved. *Id.* (quoting and adopting *Pittsley v. Houser*, 125 Idaho 820, 822, 875 P.2d 232, 234 (Ct. App. 1994)). If the primary thrust of the contract is for the sale of goods, the UCC will apply to the entire contract. *Id.*

The district court properly concluded that the verbal agreement was in fact a contract for the sale of goods and subject to the statute of frauds. Appellants urge this court to find that this

8

was not a contract for goods because SIO was processing Monsanto's waste. However, SIO sought access to Monsanto's waste so they could process and improve the sand and sell it for a profit. Even though SIO did not pay for the sand up front, they reimbursed Monsanto for the sand through a royalty after it was sold. The sale price of the silica sand was measured and paid. The mere fact that SIO paid for the sand on the back-end after it processed and sold the sand does not change the thrust of the contract from a sales contract to a service contract. Indeed, even under the pricing model used by the parties, SIO still acquired sand from Monsanto, processed it, and sold it. Additionally, both addenda, which appear to be the same type of relationship allegedly created by the verbal agreement, contained title-passing provisions of the silica sand.

It cannot be said that the silica sand is incidental to the verbal agreement. Monsanto did not bring SIO onto its quarry to process the sand—processing the sand was not a need either WGI or Monsanto had. Rather, it was SIO who recognized a potential profit from selling the sand. Also, despite SIO's contentions that they were providing a service of disposing of the waste produced by the quarry, SIO's contract was not to remove all waste; rather, the thrust of the contract was to take some of the waste, process it, sell it, and pay Monsanto for the sand sold. The agreement would not exist without the acquisition, processing, and sale of the silica sand because that was the reason for SIO's presence at the quarry—not simply to dispose of the waste. If the silica sand were removed from the verbal agreement, all but one of the four components of the verbal agreement would be compromised. Thus, the predominant factor of the verbal agreement was for the sale of goods. It is undisputed that the verbal agreement did not comply with the statute of frauds. Therefore, we conclude that the district court did not err when it found the verbal agreement unenforceable.

b. The verbal agreement is too vague, indefinite, or uncertain with respect to its essential terms.

Additionally, the verbal agreement is unenforceable because it is too vague, indefinite, or uncertain with respect to its essential terms. An agreement is unenforceable if it is "so vague, indefinite and uncertain that the intent of the parties cannot be ascertained . . . ." *Griffith v. Clear Lakes Trout Co., LLC*, 143 Idaho 733, 737, 152 P.3d 604, 609 (2007). An enforceable contract must contain the essential terms of agreement and not be too vague, indefinite, or uncertain as to those terms. *Dale's Serv. Co., Inc. v. Jones*, 96 Idaho 662, 665, 534 P.2d 1102, 1105 (1975) (distinguished on other grounds by *Peavey v. Pellandini*, 97 Idaho 655, 661, 551 P.2d 610, 616 (1976)); *see also Lawrence v. Jones*, 124 Idaho 748, 751, 864 P.2d 194, 197 (Ct. App. 1993); 1

Arthur L. Corbin, Corbin on Contracts § 4.1 (rev. ed. 1993) ("A court cannot enforce a contract unless it can determine what it is"). However, a contract does not fail for indefiniteness "if the parties have intended to make a contract and there is a reasonably certain basis for giving an adequate remedy." I.C. § 28-2-204(3).

The verbal agreement's essential terms are vague and indefinite or altogether absent. The verbal agreement does not include either price or quantity provisions. The price is set at "agreed-upon amounts" and the quantity is set at "agreed-upon quantities." Also, the duration of the contract is indefinite because there is no time period at which the contract terminates; rather, it runs in perpetuity until whatever time, if any, it no longer becomes "mutually beneficial." What constitutes "mutually beneficial" is itself uncertain. There is no reasonably certain basis on which a remedy could be fashioned. SIO concedes this was neither a requirements contract nor an output contract. There is no specific quantity in the agreement, and there was no history between the parties before entering into the verbal agreement on which a court could rely in fashioning a remedy. Thus, the verbal agreement is unenforceable because its essential terms are vague, indefinite, and uncertain.

        2.        *Breach of Implied Covenant of Good Faith and Fair Dealing.*

The district court granted summary judgment to Monsanto on SIO's claim of the breach of the implied covenant of good faith and fair dealing because the verbal agreement is unenforceable under the statute of frauds.

The implied covenant of good faith and fair dealing "requires the parties [to a contract] to perform, in good faith, the obligations required by their agreement." *Fox*, 137 Idaho at 710–11, 52 P.3d at 855–56. The district court did not err when it granted summary judgment on this claim because there was no enforceable contract obligating Monsanto.

        3.        *Equitable Estoppel.*

SIO argues the district court erred when it granted Monsanto summary judgment on SIO's claim of equitable estoppel. SIO contends that summary judgment was improper because Monsanto sought summary judgment for the first time in its reply to the motion for summary judgment. SIO argues that the district court erred when it concluded that the representation by Monsanto was so indefinite that it could not as a matter of law constitute a misrepresentation. And finally, SIO argues it was error for the district court to rule that it should have inquired into what the representations allegedly made between SIO and Monsanto meant.

10

Monsanto argues that it properly requested summary judgment on equitable estoppel in its initial summary judgment motion because it argued that the agreement was too vague and indefinite to be enforceable, and that a vague, indefinite, and uncertain agreement cannot be enforced under the doctrine of equitable estoppel.

The district court found that Monsanto was seeking judgment against SIO on all claims. The district court concluded that the representation made by Hart to Sullivan to the general effect that the contract would not be terminated after a short period of time was "so general and indefinite, that . . . as a matter of law it was not a misrepresentation or 'false representation . . . .'" Particularly, he noted that between reasonable people the representation that the verbal agreement would not be terminated "within a few years" could denote a perpetual agreement or five years.

Generally, the nonmoving party in a motion for summary judgment need only respond to those issues raised by the moving party in its opening memorandum. *See Thomson v. Idaho Ins. Agency*, 126 Idaho 527, 530–31, 887 P.2d 1034, 1037–38 (1994) (holding that a nonmoving party need only raise a genuine issue of material fact on the issues raised in the opening memorandum in support of summary judgment and not on every issue, even if not argued). However, when summary judgment on a claim is first requested in the movant's reply memorandum, the nonmoving party can waive the right to object on this procedural ground if the new claim necessarily relates to issues discussed on other claims properly raised in the opening memorandum and if the nonmoving party fails to object. *State v. Rubbermaid, Inc.*, 129 Idaho 353, 356–57, 924 P.2d 615, 618–19 (1996).

In *Rubbermaid*, the State claimed that the Rubbermaid wastebasket proximately caused the spread of a fire in the State Capitol Building. *Id.* at 356, 924 P.2d at 618. The State argued that Rubbermaid's opening memorandum in support of its motion for summary judgment failed to raise the issue of proximate cause on counts other than the State's claim for failure to warn. *Id.* Therefore, the State argued that the district court erred in considering issues not properly before it. *Id.* This Court held that even though generally the State would normally only be required to respond to the issues raised in the opening memorandum, the State waived its right to object on this procedural ground. *Id.* Particularly, the State made mention in its response memorandum that the Rubbermaid wastebasket caused the spread of the fire. Rubbermaid was therefore required to respond. *Id.* Also, the state failed to request a continuance pursuant to I.R.C.P. 56(c) to submit

11

additional evidence to contest the issues raised in the reply memorandum. *Id.* In short, the State failed to object to the inclusion of these issues in any manner. *Id.* The first objection was only after the court entered judgment in favor of Rubbermaid on a motion for reconsideration. *Id.* at 357, 924 P.2d at 619.

Neither Monsanto's motion for summary judgment, nor its opening memorandum in support of its motion for summary judgment, mentioned the claims of equitable estoppel or quasi estoppel whatsoever. The memorandum challenged the verbal agreement on the basis that the agreement was too vague, indefinite, or uncertain to be enforceable. However, in a situation similar to *Rubbermaid*, SIO raised the issue of equitable claims in its response memorandum. It was therefore appropriate for Monsanto to rebut SIO's contentions in its reply memorandum. Additionally, like *Rubbermaid*, SIO did not object to the district court's consideration of the equitable issues at any time before this appeal. Thus, SIO waived its right to object on this procedural ground.

The elements of equitable estoppel are as follows:

(1) a false representation or concealment of a material fact with actual or constructive knowledge of the truth; (2) that the party asserting estoppel did not know or could not discover the truth; (3) that the false representation or concealment was made with the intent that it be relied upon; and (4) that the person to whom the representation was made, or from whom the facts were concealed, relied and acted upon the representation or concealment to his prejudice.

*Ogden v. Griffith*, 149 Idaho 489, 495, 236 P.3d 1249, 1255 (2010). This Court has held that equitable estoppel is appropriate in cases where a purported agreement does not comply with the statute of frauds. *Id.*; *Boesiger v. Freer*, 85 Idaho 551, 556, 381 P.2d 802, 804 (1963). The doctrine of equitable estoppel "assumes the existence of a complete agreement," which is not unenforceable as vague or incomplete. *Lettunich v. Key Bank Nat'l Ass'n*, 141 Idaho 362, 367, 109 P.3d 1104, 1109 (2005).

In *Lettunich*, this Court held that there was no evidence in the record of a complete and enforceable agreement. *Id.* Particularly, essential terms like the amount of the loan, the interest rate, the disbursement schedule, the terms of repayment, and the security of the loan were missing from the verbal agreement. *Id.* Together, the oral agreement to loan money was "vague, incomplete and unenforceable." *Id.* Since equitable estoppel assumes the existence of a complete agreement, equitable estoppel did not apply. *Id.*

12

We hold that the district court properly granted summary judgment on SIO's equitable estoppel claim. The sole representation on which equitable estoppel was claimed was the statement from Monsanto's agent, Mitchell Hart, to SIO's agent, Robert Sullivan, that Monsanto "would not abruptly terminate the Monsanto Agreement after a short period of time."[4] However, as discussed above, the alleged verbal agreement was unenforceable because it was vague, indefinite, and uncertain. It is both vague and indefinite as to what constitutes a short period of time. It could be a matter of years, or as SIO noted below, it could "continue indefinitely." Other elements of the agreement, including the quantity and price terms were also uncertain. The district court's grant of summary judgment on SIO's equitable estoppel claims is therefore affirmed.

### 4.    *Quasi-estoppel* .

The district court granted summary judgment to Monsanto on SIO's claim of quasi-estoppel on the basis that SIO is unable to meet the requirements of quasi-estoppel. The district court held that SIO cannot demonstrate a finding that Monsanto took an inconsistent position because the statements were so vague and uncertain that SIO is unable to demonstrate an inconsistent position.

The doctrine of quasi-estoppel "prevents a party from reaping an unconscionable advantage, or from imposing an unconscionable disadvantage upon another, by changing positions." *Garner v. Bartschi*, 139 Idaho 430, 437, 80 P.3d 1031, 1038 (2003). Unlike equitable estoppel, quasi-estoppel does not require either misrepresentation by one party or the reliance by the other. *Id.* The elements of quasi-estoppel are as follows:

> [Quasi-estoppel] prevents a party from asserting to another's disadvantage a right inconsistent with a position previously taken by him or her. The doctrine applies where it would be unconscionable to allow a person to maintain a position with one in which he acquiesced or of which he accepted a benefit. The act of the party against whom the estoppel is sought must have gained some advantage to himself or produced some disadvantage to another; or the person invoking the estoppel must have been induced to change his position.

*Id.* (quoting *E. Idaho Agric. Credit Ass'n v. Neibaur*, 133 Idaho 402, 410, 987 P.2d 314, 322 (1999)).

---

[4] Whether the agreement was abruptly terminated could have multiple meanings. On one hand, it could mean that the agreement would not be terminated after a short period of time. On the other hand, it could mean that the agreement would not be suddenly terminated without much notice. The context of this representation indicates the former. Sullivan and Hart clearly discussed a "long term relationship," and SIO's briefing is concerned with the duration of the agreement and not the suddenness of the agreement's termination.

Here, SIO failed to provide any evidence that an inconsistent position was taken by Monsanto. According to SIO, Monsanto entered a verbal agreement in which it agreed to permit SIO to process an undefined amount of sand for an undefined price, to be sold in whatever markets Monsanto permitted. Monsanto's agent, Mitchell Hart, apparently took the position that the agreement would not be abruptly terminated. Indeed, the agreement was not abruptly terminated: it was in effect for eight years after the agreement was made, it was in effect longer than the Master Agreement, which had a term of five years. The issue is one of SIO's reliance on vague and ambiguous language and not one of Monsanto taking inconsistent positions. Assuming as this Court must the existence of the verbal agreement, the record is clear that the agreement was not abruptly terminated. Thus, the district court did not err in granting summary judgment to Monsanto on SIO's claim for quasi-estoppel.

**C.    The district court did not err when it granted WGI summary judgment.**

*1.    Tortious Interference with a Contract.*

The district court granted WGI summary judgment, sua sponte, on SIO's claim of tortious interference with a contract on the grounds that WGI had no knowledge of the verbal agreement between SIO and Monsanto. The district court concluded that there was nothing in the record that demonstrates that WGI knew of the verbal agreement, which is supported by its decision to enter into an express verbal agreement with SIO.

SIO contends that the district court erroneously granted summary judgment on the basis that SIO failed to raise any evidence that WGI knew of the verbal agreement with Monsanto because summary judgment was not requested on that issue and so SIO had no burden to produce evidence on this point. SIO also argues that there was evidence in the record of WGI's knowledge of the verbal agreement because WGI and SIO worked closely on royalty payments and transferring sand. This evidence suggests WGI had knowledge of the verbal agreement argues SIO.

WGI concedes that the district court improperly granted summary judgment on the failure of evidence claim because summary judgment was requested on the basis that the verbal agreement was not a contract; thus, there could be no tortious interference with a contract. However, WGI argues the error was harmless because SIO is not capable of providing evidence indicating that WGI knew of the verbal agreement, and that the verbal agreement was not actually a contract.

14

a. The district court erred when it granted summary judgment on the basis of SIO's inability to demonstrate that WGI had knowledge of the verbal agreement.

On a motion for summary judgment, the "burden of proving the absence of a material fact rests at all times upon the moving party." *Tingley v. Harrison*, 125 Idaho 86, 89, 867 P.2d 960, 963 (1994).

> The moving party bears the burden of establishing the absence of a genuine issue of material fact. Thus, it follows that if the moving party fails to challenge an element of the nonmovant's case, the initial burden placed on the moving party has not been met and therefore does not shift to the nonmovant. Therefore, the burden never shifts to the non-movant to oppose the motion if the movant fails to raise the issue in the first place. The non-moving party must object or contest the inclusion of additional issues at the motion hearing; otherwise any objection is deemed waived.

*Aardema v. U.S. Dairy Systems, Inc.*, 147 Idaho 785, 793, 215 P.3d 505, 513 (2009).

The district court improperly granted summary judgment on the basis of SIO's inability to demonstrate that WGI had knowledge of the verbal agreement; a point WGI does not contest. WGI requested summary judgment on the basis that the verbal agreement was not an enforceable contract. A party is generally only required to raise a genuine issue of material fact on the issues raised in the opening memorandum in support of summary judgment. *See Thomson v. Idaho Ins. Agency*, 126 Idaho 527, 530–31, 887 P.2d 1034, 1037–38 (1994). Here, whether WGI had knowledge of the verbal agreement was not argued. Hence, the burden did not shift to SIO to raise a general issue of material fact; rather, the burden to establish the absence of a genuine issue of material fact remained with WGI, and WGI failed to satisfy that burden because it did not argue or even raise this point. Additionally, this is not a situation in which the issue of WGI's knowledge would necessarily be discussed on other claims for summary judgment because like *Aardema*, "whether a special relationship exists is an issue that is unique to the factual relationship between specific parties and is not one which may be addressed without the benefit of full briefing and the opportunity to reply." 147 Idaho at 793, 215 P.3d at 513. Here, the relationship between WGI, SIO, and Monsanto is in dispute.

Regardless, it is not entirely clear that WGI had knowledge or reason to know of the verbal agreement between Monsanto and SIO, which occurred prior to SIO and WGI entering the Master Agreement. There is some evidence to indicate that WGI knew or should have known

15

of the verbal agreement. But ultimately, whether WGI had knowledge of the verbal agreement is irrelevant to the disposition of this matter.

>b. The district court did not err when it granted summary judgment to WGI on SIO's tortious interference with contract claim.

It is a settled principle of law that a contract failing under the statute of frauds is not void but is voidable. *Slusser v. Aumock*, 56 Idaho 793, 794, 59 P.2d 723, 724 (1936); *Bevercombe v. Denney & Co.*, 40 Idaho 34, 39, 231 P. 427, 429 (1924); *see also* 3 Williston on Contracts §7:13 (4th ed.) ("Indeed, with respect to the Statute of Frauds, though the Statute is wholly unsatisfied, and the entire transaction oral, by the majority rule, the contract is not absolutely void, but only unenforceable or voidable at the election of the party against whom enforcement is sought"). Indeed, this Court has made clear that the statute of frauds is an affirmative defense. *Rowley v. Fuhrman*, 133 Idaho 105, 108, 982 P.2d 940, 943 (1999). This Court has held that a claim for tortious interference with a contract is available when a contract is voidable or unenforceable but is not available when the contract is void ab initio. *Barlow v. Int'l Harvester Co.*, 95 Idaho 881, 893 & n.2, 522 P.2d 1102, 1114 & n.2 (1974) (citing W.L. Prosser, Handbook of the Law of Torts § 129, 932 (4th ed. 1971)). Recently, this rule was reiterated in *Commercial Ventures, Inc. v. Rex M. & Lynn Lea Family Trust*, 145 Idaho 208, 217, 177 P.3d 955, 964 (2008), where this Court held that a "contract need not be enforceable in adversary proceedings" to be subject to a claim for tortious interference. Furthermore, as to "the issue of voidability because of noncompliance with the statute of frauds, we note that a contract voidable because of such noncompliance may still be the subject matter of an action for interference with contract." *Barlow*, 95 Idaho at 894 n.3, 522 P.2d at 1115 n.3.

In the present matter, the verbal agreement is unenforceable because of noncompliance with the statute of frauds. However, since the statute of frauds is an affirmative defense that renders the contract voidable and unenforceable—not void—SIO is not precluded from pursuing its claim against WGI for tortious interference with the verbal agreement on that basis. The district court's grant of summary judgment to WGI cannot be affirmed on this alternate ground as urged by WGI. However, the verbal agreement is not only voidable under the statute of frauds, it is also unenforceable as being too vague, indefinite, and uncertain with respect to its essential terms. A party cannot tortiously interfere with an agreement that is too vague and uncertain to be enforceable. *See Griffith v. Clear Lakes Trout Co.*, 143 Idaho 733, 737, 152 P.3d

16

604, 608 (2007) (noting that where a contract is too vague, indefinite, and uncertain as to its essential terms, and not merely ambiguous, there has been no "meeting of the minds" which is necessary for contract formation and courts will "leave the parties as they found them"); *Dale's Serv. Co. v. Jones*, 96 Idaho 662, 664–65, 534 P.2d 1102, 1104–05 (1975) ("Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have been held to prevent the creation of an enforceable contract"); 17A C.J.S. Contracts § 169 ("A contract is considered void where one of the elements essential for the formation of a valid contract is missing"). The district court, therefore, did not err in granting WGI summary judgment on this claim.

### 2.	*Breach of implied covenant of good faith and fair dealing.*

The district court granted summary judgment to WGI on SIO's claim for breach of the implied covenant of good faith and fair dealing under the Master Agreement because while there were genuine issues of material fact on most issues, there was no genuine issue of material fact on the issue of damages. The district court concluded that SIO only alleged damages through the affidavit of Ken Goates, which are not supported by the record. Particularly the district court ruled that "there is nothing in the Master Agreement . . . or the record . . . that would establish that consequential damages of the type outlined by Kent Goates in his affidavit were within the contemplation of the parties at the time of contracting."

SIO argues that the district court erred when it concluded that there was no genuine issue of material fact as to damages because the Master Agreement required WGI to take charge of the installation, operation, and maintenance of SIO's equipment at the quarry. Specifically, SIO points to a screen that SIO requested WGI to build, but on which SIO claims WGI ran up the cost resulting in damages between $125,000 and $150,000.

WGI argues that SIO failed to offer any evidence of recoverable damages. Specifically, WGI argues that the only evidence of damages offered by SIO is the alleged run up of the cost of the screen. However, that evidence, WGI maintains, is buried in SIO's opposition to the motion for summary judgment, and thus, the district court did not err when it did not consider the evidence of the screen. Finally, in the alternative, WGI maintains that it was not obligated under the Master Agreement to provide SIO one of its own screens.

In every contract there is an implied covenant of good faith and fair dealing, which "requires the parties to perform, in good faith, the obligations *required by their agreement*."

17

*Wash. Fed. Sav. v. Van Engelen*, 153 Idaho 648, 656, 289 P.3d 50, 58 (2012) (emphasis added). The implied covenant of good faith and fair dealing does not create independent obligations, it merely applies to contractual obligations. *Idaho First Nat. Bank v. Bliss Valley Foods, Inc.*, 121 Idaho 266, 288, 824 P.2d 841, 863 (1991) (holding that the covenant only requires "that the parties perform in good faith *the obligations imposed by their agreement*" (emphasis added)). Thus, before a party can breach this covenant there must be a contract. Damages need not be proved with mathematical exactitude. *Gillingham Constr., Inc. v. Newby-Wiggins Constr., Inc.*, 142 Idaho 15, 26, 121 P.3d 957, 968 (2005). "[T]he trial court is not required to search the record looking for evidence that may create a genuine issue of material fact; the party opposing the summary judgment is required to bring the evidence to the court's attention." *Vreeken v. Lockwood Eng'g*, 148 Idaho 89, 103–04, 218 P.3d 1150, 1164–65 (2009) (quoting *Esser Elec. v. Lost River Ballistics Tech., Inc.*, 145 Idaho 912, 919, 188 P.3d 861, 868 (2008)).

In *Vreeken*, the appellants argued that the district court erred in its grant of summary judgment even though they wholly failed to contest summary judgment below. *Id.* at 103, 218 P.3d at 1164. The appellants argued that the district court erred in granting summary judgment because it should have searched through the record to ascertain whether there existed genuine issues of material fact. *Id.* This Court rejected the appellants' argument and held that it was their obligation to bring the evidence of the genuine issues of material fact to the trial court's attention. *Id.* at 104, 218 P.3d at 1165. Therefore, the district court did not err in granting summary judgment. *Id.*

SIO claims WGI breached its implied covenant of good faith and fair dealing imposed under the Master Agreement, not the verbal agreement between SIO and Monsanto. The district court did not err in granting summary judgment on the matter of damages. In response to WGI's request for summary judgment, SIO responded with specific damages figures. To support these figures, SIO attached to its response the expert affidavit of Kent Goates who explained his calculations. Goates's calculations were based in part on the "development and operation of the business." However, Goates did not specify any particular expenses incurred by SIO, or reference any evidence to explain how an operation that always operated at a deficit could sustain damages by the termination of the operation.. The district court ruled that the conclusions of Goates were not supported by the record so it did not look at his affidavit. Indeed, SIO's opposition to summary judgment made various allegations, which could support some of

18

Goates's estimates. These allegations include that (1) WGI built a screen for SIO but did so in a slow and inefficient manner resulting in damages.; (2) WGI dragged its feet in constructing the onsite facility; (3) WGI restricted the ability of SIO to move about the quarry; (4) WGI refused to procure a dump truck for SIO then required SIO to lease a dump truck at unreasonable rates; (5) WGI provided an inadequate backhoe, requiring SIO to purchase its own; (6) WGI provided an inadequate forklift, requiring SIO to purchase its own; (7) WGI Overcharged SIO on labor; (8) and that the Master Agreement provided that WGI should be "responsible for all fees, taxes, utilities, costs, and expenses to manage, construct, maintain, insure, and operate the Facility."

These allegations, even though they relate to the operation of SIO's business at the quarry, which Goates examined when estimating damages, are merely allegations and are not substantiated by any tangible evidence. Therefore, WGI satisfied its burden of demonstrating an absence of a genuine issue of material fact as to damages. As noted by the district court, SIO

> completely fails to establish or document any damage flowing from this claimed breach of the implied covenant of good faith and fair dealing . . . .
>
> The damage evidence that is in the record on summary judgment seems to be directed at the other claims discussed and dismissed above. However, to the extent that the damages being set forth in the affidavit of Kent Goates are being asserted as an element of damage on SIO's claim of breach of the implied covenant of good faith and fair dealing as that claim relates to WGI, those claimed damages are misplaced and cannot survive summary judgment. . . .
>
> There is nothing in the Master Agreement between SIO and WGI or the record on summary judgment that would establish that consequential damages of the type outlined by Kent Goates in his affidavit were within the contemplation of the parties at the time of the contracting. Similarly, there is nothing in the Master Agreement or the record on summary judgment to suggest that lost profits were in the contemplation of the parties when the contract was created. Without such a showing, these types of damages are not allowed, as a matter of law, in a contract action. The only damages that 'arise naturally' from the breaches claimed by SIO would be the damages referred to by SIO in its discovery responses referenced in the reply memorandum . . . However, as stated above, these damages are only conclusory in nature and cannot, without quantifying the same, give rise to a genuine issue of material fact on summary judgment.

There is absolutely nothing in the record that quantifies or establishes the amount of damages claimed by SIO as a result of WGI's alleged breach of the covenant of good faith and fair dealing[5]. The Goates affidavit and report, which discuss damages, do not distinguish

---

[5] All of SIO's allegations in support of damages are supported by an interrogatory answer. Upon closer review, however, the interrogatory merely contains allegations and not supporting facts. Despite the call of the

19

between damages incurred as a result of actions by Monsanto and those alleged in the conclusory interrogatory answer attributable to WGI. Because SIO cannot prove any damages incurred from the Master Agreement, the district court was correct in granting summary judgment to WGI.

### D.     Attorney Fees on Appeal.

Monsanto and WGI each requests attorney fees on appeal pursuant to I.C. § 12-120(3). That section grants the prevailing party the right to recover attorney fees in any action to recover in a commercial transaction. A commercial transaction is defined as "all transactions except transactions for personal or household purposes." I.C. § 12-120(3). Here, SIO sought to recover on a transaction for the purchase of silica sand, which was not a transaction for a household purpose. Therefore, Monsanto and WGI, as the prevailing parties, are each entitled to attorney fees on appeal. WGI also requests attorney fees on appeal pursuant to section 16 of the Master agreement, but because WGI has been awarded attorney fees pursuant to I.C. 12-120(3), it is not necessary to decide whether it is entitled to attorney fees under the Master Agreement.

### VI. CONCLUSION

The district court did not err when it granted Respondents' motion to strike the Hart email and did not err when it granted Monsanto and WGI summary judgment as to all of SIO's claims against them. Its judgment is affirmed. Monsanto and WGI are each granted attorney fees and costs on appeal.


Chief Justice BURDICK, Justices EISMANN, J. JONES and HORTON, CONCUR.

---

interrogatory—which asks for specific details of allegations, including when the allegations happened, who took such action, and how it hindered work—SIO's responses sometimes referenced years but sometimes did not. They did not reference any particular employee at WGI. SIO does not even provide figures of what it cost to procure a dump truck, backhoe, and forklift; presumably these are figures of which SIO had knowledge.